UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:19-cr-10016-DPW |
| | ) | |
| JOQUENTZ CONSTANT | ) | |

<u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Joquentz Constant stands convicted by a jury of illegal possession of a firearm. Mr. Constant exercised his Constitutional right to require the government to meet its burden of proving his guilt beyond a reasonable doubt. There is no dispute regarding the criminal history computation (criminal history category III based on 4 points) applicable at sentencing. Mr. Constant agrees that the total offense level prior to acceptance is 18. With acceptance recognized, Mr. Constant's total offense level is 15, resulting in an advisory guideline range of 24-30 months. Otherwise, the advisory guideline range is calculated at 33-41 months. Mr. Constant has been in custody based on this conduct for approximately 18 months, although not continuously.[1]

Over the last several months, Mr. Constant has reflected on his conduct and life. This natural reflection occurred within the climate of fear and anxiety pervading correctional institutions during the current pandemic. In this climate, his primary thoughts focus on his parents and siblings, and his desire to see them again. Charitable Constant and her husband Joquentz have been married for over 30 years and live in Dorchester. Together, they raised four children. Mr. Constant's siblings include his oldest sister – a nurse residing in Canada; older brothers Kerlentz – a 2nd Lieutenant in the U.S. Army; older brother Gary – a Marine Corps

---

[1] He was released briefly on bail in the state matter before Federal authorities arrested and indicted him on the same conduct in January, 2019.

veteran and current art student; and his youngest sister who is 16 years old. Mr. Constant's family – particularly his brothers – stand ready and motivated to provide a structure for Joquentz, upon his release to help him make the changes in his life. Mr. Constant deeply regrets putting his loving and supportive family through the shame, embarrassment, and heartache of this ordeal, caused by his irresponsible conduct. He now seeks to be held accountable for that conduct, and accountable for the changes he must now make.

In his letter filed as Exhibit A, Kerlentz Constant outlines his view of his brother's path in his life up to now. 2nd Lt. Constant writes:

> "He has a positive outlook on life and does not blame anyone for his mistakes. Talking to him over the phone I can tell he has reflected on many things about his past and has a solid plan to earn his G.E.D and go to college when he gets released. I know prison is not his destiny and I know he will keep trying to improve himself for the better. My family and I are prepared to give him the support that he needs to get over this dark period of his life to a prosperous future."

Mr. Constant's other brother, Gary, is a talented artist, enrolled at Massachusetts College of Art. Gary's art includes clothing, woodworking, and clocks. See Exhibit B. He lives in Brighton and will provide a home for his brother upon release. Kerlentz Constant thoughtfully explains in his letter Gary's background and the positive impact he will provide Joquentz upon release:

> "If he gets released, we have arranged that he will be living with my brother Gary in Brighton, MA. Gary is a Marine Corps veteran and is currently pursuing a bachelor's degree in Fashion Design at Massachusetts College of Art and Design. Gary is older than Joquentz, he always had a great relationship with Joquentz as well as a positive influence. In addition to being a student, Gary has recently started a creative studio business, where he offers a few different services, including styling, where Joquentz will be trained and work. Moreover, collectively we will support him financially until he finds a job and starts working. Gary will help him enroll in school again to finish his G.E.D. I will be communicating with him consistently to make sure that he is staying on track and offer any support he might need."

This provides a window into the kind of structure and concrete opportunities for rehabilitation that Mr. Constant will look forward to on the outside. This experience of being in

custody during the terrifying climate of a pandemic shifted many things into perspective for Mr. Constant. Getting his GED, something to which he has striven for over many years, will be a first priority. After accomplishing that goal, Mr. Constant has many thoughts about opportunities he can pursue. He understands how fortunate he is to have a family who, in spite of his failings and criminal behavior, stand behind him, willing to help in any way they can.

I. <u>Proceedings to Date</u>

Boston Police arrested Mr. Constant on August 25, 2018 on this conduct. He was held in jail until October, 2018, when the court released him on electronic monitoring. In January, 2019, approximately one month after his release, the Federal government adopted the state case and arrested him. On January 16, 2019, Mr. Constant made his initial appearance in federal court, charged in a single count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He remained held in continuous federal custody since that appearance. In the wake of <u>Rehaif v. United States</u>, No. 17–9560, 588 U.S. __ (2019), a subsequent grand jury returned a superseding indictment. On September 12, 2019, the Court arraigned Mr. Constant on the new charge. A jury trial scheduled to begin on November 18, 2019 was postponed to permit discovery relating to Boston Police Department's video capabilities and preservation practices. The Court held hearings on November 18, 2019 and on January 6, 13, and 15, 2020. Trial commenced on January 21, 2020, and concluded on January 23, 2020. The jury returned a verdict of guilty. Sentencing is scheduled for May 26, 2020.

II. <u>Nature and Circumstances of Offense</u>

The jury convicted Mr. Constant of the charged offense of possession of a firearm on August 25, 2018 while in Dorchester. Mr. Constant had a prior conviction that prohibited him from legally possessing the firearm, which had an obliterated serial number.

III. <u>Mr. Constant's Personal History</u>

Mr. Constant is 24 years old, born in Haiti to married parents. At age 7, he accompanied his parents and siblings to the United States, where he struggled to adjust to this new environment. He struggled with the language barrier as well as the teasing of other children. He and his four siblings grew up in a loving home. To support the family, Mr. Constant's father worked as a taxi driver. Once his parents naturalized, he too became a United States citizen.

His brother, Kerlentz recalls of their childhood:

> Before joining the military, I lived in Boston with Joquentz, three other siblings, and our parents. As the older brother, I watched Joquentz grow up from a child to a man. Upon meeting him you will find that he is respectful, kind, caring, cheerful, detail-oriented, and very intelligent. He also has an excellent rapport with people, anyone who meets him likes him instantly, and because of this, he has friends of all ages who love and respect him. Early on as a child Joquentz had a curious mind and was very ambitious. He would always ask questions about things that were beyond his age. It was clear to our family that he would grow up to achieve great things in life.

By middle school, Joquentz began struggling academically. His brother recalls an event that he believes affected his brother's academic and life path:

> The first catastrophic event that negatively impacted his life was being placed in a Juvenile Detention Center for a minor incident while he was in school. This not only interfered with his education by being held back from progressing into the next grade level, but it also hindered his entire life. Returning to school the next year teachers and peers alike started treating him like a bad guy. That made him feel like an outcast and was no longer comfortable in the school, his academic grades plummetted, and got into more troubles.[2]

During this time, Joquentz was diagnosed with Attention Deficit Disorder and doctors initially prescribed medication and counseling. This course of treatment continued for a period of time, but in his early teenaged years he stopped all medication and mental health treatment. PSR ¶ 57. Joquentz ultimately dropped out of high school in the 11th grade.

---

[2] It should be noted that Mr. Constant has no adjudicated juvenile history on his record. Government Exhibit A references an incident involving a stolen laptop at the Lyndon K-8 school in West Roxbury, and the school called Boston Police.

His brothers took a very different path after high school. Both served in the United States armed forces. His oldest brother is currently serving in the Army and stationed in Georgia. His other brother served in the United States Marine Corps before pursuing his dreams at the Massachusetts College of Art. His oldest sister, similarly, made her career a primary focus after high school. Today, she is a nurse and married with children. Joquentz's youngest sister is still in high school and lives with their parents.

Despite his lack of high school degree, Mr. Constant is an individual who has worked successfully in the past, a good indicator of his ability to do so again in the future. Prior to his current confinement, he has worked steadily for good wages. At the time of his arrest, he worked as a cook at Fire and Ice Restaurant in Watertown, earning $23/hr. Before that, he worked in construction, earning $17/hour, and as a construction laborer, earning $37/hr. He credits his high hourly earnings to YouthBuild, a non-profit committed to providing young people with the support and credentials needed to successfully enter the building trades; there he earned OSHA and construction related certificates upon his graduation from the program in 2017. In this program, he also learned to culinary skills, and worked for the Green Team, planting flowers and doing clean-up work in Dorchester.

Mr. Constant has no drug history and rarely drinks. While in Plymouth, he entered a GED program. Unfortunately, this program abruptly ended with the onset of the jail's response to the COVID-19 crisis. His first priority upon release will be enrolling in programming to help him accomplish his long-held goal of completing his GED.

Earning his GED will open doors not only for employment, but for training programs that can lead to a career. Counsel spoke with an individual who had been involved with College Bound in Dorchester when Mr. Constant was enrolled there. Similar to the sentiments by Mr. Constant's brother in Exhibit A, he notes that Mr. Constant could really benefit from structure.

Specifically, he has discussed "Operation Exit" with Mr. Constant and encouraged him to apply once he meets the threshold requirement: earn his GED.

Operation Exit is a program launched by Mayor Walsh in 2014 to give young people returning from incarceration a second chance to improve their lives by training for successful new careers in the building trades. Mr. Constant will need a referral into the program, which runs typically once a year. If accepted, he will receive a stipend and individualized case management to learn job skills. Operation Exit includes a support team of partners dedicated to the success of each participant, including YOU Boston, the Mayor's Office of Public Safety, and the Boston Police Department. The program describes a 76% Placement Rate, 86% Job Retention Rate, $18.96 Avg. Wage, 2% Two-Year Recidivism Rate. See http://www.youboston.org/services/operation-exit/

This program would be an excellent fit for an individual like Mr. Constant, and he is eager to take the steps to make himself eligible for enrollment.

Finally, Mr. Constant has suffered from periodic and often exercise-induced asthma. PSR ¶ 55. He recalls having to use a nebulizer when he was a young child after moving from Haiti. While he has not experienced serious treatment for this disorder as an adult, it is a concern for him as he continues to live in a prison setting. If sentenced to additional incarceration, he will be transferred from Plymouth (2 positive cases) to Wyatt (as of the date of this filing, 45 confirmed positive COVID-19 cases).

For Mr. Constant, rehabilitation should be a primary sentencing goal. Unfortunately, it is unclear when programming in BOP will resume. Because of this lack of rehabilitative programming, further incarceration will only delay Mr. Constant's progress. He is a young man with a real prospect at turning his life trajectory in a new direction. The longest sentence he has previously served is 9 months, and that was with credit for 37 days served, when he was 18 years old. PSR ¶ 31. If awarded acceptance, his advisory guideline range is 24 months at the low end.

A time-served sentence would avoid him being sent to Wyatt for classification. Any additional time in custody is therefore "greater than necessary" to achieve the sentencing goals.

IV. <u>The Applicable Guideline</u>

The applicable guideline under USSG § 2K2.1 is 14, plus 4 points for obliterated serial number, (18), less 3 for acceptance of responsibility, resulting in a total offense level of 15. His criminal history category is CHC III, so the resulting guideline is 24-30 months.

a. <u>Mr. Constant Should Not Be Penalized for Invoking His Right to Trial</u>

Mr. Constant exercised his right to trial, insisting, as is his right, that the government prove its case beyond a reasonable doubt.

The Guidelines anticipate that the acceptance of responsibility reduction may be appropriate after trial, noting that "[c]onviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction." USSG §3E1.1 (App. Note 2). This is as it must be; any other interpretation would unmask the "acceptance" reduction as a trial penalty. But the reduction is too seldom conferred. One 2009 study showed that nationally "3% of trial defendants received the two point acceptance of responsibility reduction and 2% of them received the full three point reduction." Jeffery T. Ulmer, James Eisenstein and Brian D. Johnson, Trial Penalties in Federal Sentencing: Extra-Guidelines Factors and District Variation, Justice Quarterly, 2009. If the reduction is to function as more than a trial tax, it must be conferred more frequently.

The right to trial is of course among the bedrocks of our judicial system. Thomas Jefferson said, "I consider [trial by jury] as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." Letter from Thomas Jefferson to Thomas Paine, 11 July 1789. Trials serve as a check on prosecutorial power, assure active judicial oversight of criminal proceedings, and guarantee the full exercise of due process for defendants. These protections disappear if a defendant is viewed as not accepting responsibility

because he exercises his right to a jury verdict. It is no answer that a guilty plea reflects contrition; most defendants plead, not due to contrition, but because "[sentencing] guidelines … provide prosecutors with weapons to bludgeon defendants into effectively coerced plea bargains." Hon. Jed S. Rakoff, "Why Innocent People Plead Guilty", N.Y. Rev. of Books, November 20, 2014. If the courts become mere plea-mills with justice being done only at the whim and will of an obliging government and then only when its ends are served, the claim of justice under law will prove empty.

    This Court has spoken directly to the issue, framing the issue quite pointedly: "we are presented, aren't we, with a fairly raw question of what does it cost you to go to trial?"

> "There is, of course, embedded in the Sentencing Guidelines a concept of acceptance of responsibility. It is, as I indicated from my perspective, a Faustian bargain made by the Sentencing Commission in recognition of practices that have developed, but frankly I am indifferent to it in making my own judgment about what the proper sentence should be.
>    ….
> That brings me, finally, back to the larger question that I started our discussion with this afternoon, which is should the system of justice, the grinding mechanisms, be so concerned about their own efficiencies that in a pretextual form they burden the exercise of the Constitutional right to go to trial? I do not believe they should, and I have tested this sentence against that, asking myself am I making this choice in some fashion because of Mr. Fields' decision vigorously to defend his case, vigorously but within I think professional limits, not in an effort to harm other persons by pursuing his case? I think that my sentence does not do that, that is, it does not burden it.
> ….
> There is much discussion, more discussion of late, about the process of negotiating pleas. It was heralded by the Supreme Court last term. It has agitated the public mind more recently in this District. It is something as to which one would hope for greater public understanding about the respective roles of defense counsel vigorously to represent their clients and prosecutors to uphold their version of the law.
>
> But, ultimately, they are adversaries. The resolution has to be with the judge. The judge has to make the decision, not doing a high-low and saying, well, the Government is over there, the defendant is over here, I will be in the middle and people will think I have been moderate, not by embracing one side or the other, not by making decisions on the basis of perceptions that that there has been misconduct … by the defense by being too, to use a phrase of the Government, "scorched earth" in tactics….
>
> Those kinds of things are not part of the calculus.

> The defendant does not go free or even get a benefit from some demonstration of misconduct, nor does the defendant get somehow punished because his counsel has been particularly vigorous.
>
> The short of it is, as I have said, I have tried to consider all of the factors in this case in a fashion that calibrates, as best I can, the respective responsibilities of the several parties involved here that I know most about in the development of the case ….

United States v. Field, No. 1:10-cr-10388-DPW (dkt 413) at 72, 80-81 (Feb. 25, 2012).

According to USSC statistics from FY2015, only 2.9% of defendants in federal cases nationally went to trial, with 6.7% doing so in this District. By FY2017, the national rate was 2.8%, with the rate in this District falling to 3.6%. By FY2019, the national rate was 2.4%, with the rate in this District a heartening 7.1%. See USSC, Sourcebook of Federal Sentencing Statistics, "Guilty Pleas And Trials In Each Circuit And District," FY 2015, FY 2017, FY 2019. Over many years, the trial rate has collapsed. "[W]hereas in 1980, 19 percent of all federal defendants went to trial, by 2000 the number had decreased to less than 6 percent and by 2010 to less than 3 percent, where it has remained ever since." Rakoff, supra. These numbers suggest that the right to trial is endangered nationally, even in this District. The decline in trials is linked in part to the acceptance of responsibility reduction, which can be seen as a tax on the exercise of a Constitutional right. The decline is further entrenched by the disparity in treatment of defendants who plead and thus benefit from the government's frequent willingness to offer benefit.

The "trial penalty" is severe; according to one study, "Overall, controlling for all other factors, the sentence following a jury trial conviction is 44.5 months more severe than the sentence imposed after a guilty plea." Candace McCoy, Plea Bargaining as Coercion: The Trial Penalty and Plea Bargaining Reform, 50 Crim. L.Q. 67 (2005). The plea reward/trial penalty dynamic is both documented and lamented. See, e.g., Gene M. Grossman & Michael L. Katz, Plea Bargaining and Social Welfare, 73 Am. Econ. Rev. 749, 752-56 (1983); Nancy J. King et al., When Process Affects Punishment: Differences in Sentences After Guilty Plea, Bench Trial, and Jury Trial in Five Guidelines States, 105 Col.L.Rev. 959, 973-75 (2005) (finding that

defendants who pled guilty to certain offenses received lower sentences than those who had jury trials for the same offenses); Jeffery T. Ulmer & Mindy S. Bradley, Variation in Trial Penalties Among Serious Violent Offenses, 44 Criminology 631 (2006); An Offer You Can't Refuse: How US Federal Prosecutors Force Drug Defendants to Plead Guilty, Human Rights Watch 102-12 (Dec. 2013) ("Plea bargaining means higher sentences for defendants who go to trial.")

Defendant submits that his expression of remorse should be considered for the acceptance of responsibility reduction notwithstanding the fact that the conviction stems from a jury verdict.

V. The Guidelines: National Trends

Nationally, the rate of within-guideline sentences has consistently remained at or below 50%, moving from 52% in FY2012, to 51% in FY2013, to 46% in FY2014, to 47.3% in FY2015, to 48.6% in FY2016, to 49.1 in FY2017, and to 51.4 in FY 2019. See USSC, Comparison Of Sentence Imposed And Position Relative To The Guideline Range, Table 8, FY 2017. In this District, the rate has been well below 50%, from 43% in FY2012, to 39% in 2013, to 23% in FY2014, to 25% in FY2015, to 27.5% in FY2016, to 31% in FY2017 and to 37.2% in FY 2019. See Statistical Information Packet, Fiscal Year 2019, District of Massachusetts.

VI. A Fair Balancing of 3553(a) Factors should focus on Rehabilitation as a Primary Sentencing Goal

Mr. Constant remained in state custody based on this conduct from August 27, 2018, until October 26, 2018. PSR ¶ 38. This period of approximately 60 days was not credited to any other case, as the Commonwealth dismissed the case following the federal indictment. This time should therefore be properly credited to this sentence. Mr. Constant has been in continuous federal custody since January 16, 2019. The total time spent in custody on this case amounts to approximately 18 months credit.

Here, a sentence of "time served" – taking into consideration the time spent in custody on the related state charge - comports with each of the sentencing criteria: it is sufficient, but not

greater than necessary, to achieve the sentencing goals under 18 U.S.C. § 3553(a)(1). United States v. Kimbrough, 128 S.Ct. 558 (2007); United States v. Booker, 125 S.Ct. 738 (2005); United States v. Martin, 520 F.3d 87 (1st Cir. 2008); United States v. Rodriguez, 527 F.3d 221 (1st Cir. 2008).

Pursuant to 18 U.S.C. §3553(a)(2), the court must consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Here, a primary focus should be on the "kinds of sentencing available" and the need to focus on rehabilitation. At this moment in time, it is unclear that any programming will be available to Mr. Constant in prison. He has served significant time in custody to date for someone who has never previously served more than 9 months. With a GED and structured programming on probation, he has a chance of being a success story – someone who can come back and mentor and give back to his community. He has strong family support. The programming to set Mr. Constant on a new path exists: just not in a prison setting.

Further, Mr. Constant reports breathing issues as a child, and exercise-related asthma as an adult. The most recent report to the Courts for Wyatt (May 18, 2018) tallies 45 inmates testing positive for the virus. Mr. Constant is currently held at Plymouth, and once sentenced, will be transferred to Wyatt for classification. The current state of the pandemic means that jail settings can be very dangerous for the transmission of the virus and for complications if infected.

VI.  The Appropriate Sentence

The defense advocates for a sentence 6 months below the low-end of the guidelines when awarded acceptance. This request is supported by the strength of the release plan with his brother

in Brighton, and Mr. Constant's prospects for rehabilitation. Mr. Constant is a member of a family with considerable accomplishments. He possesses work skills and a demonstrated work history. For his behavior, he has experienced 18 months of imprisonment – longer than any previous incarceration and one served subject to the stress and restrictions of pandemic operations.

Mr. Constant has a concrete plan for supervised release: to live with his brother, an ex-Marine, in Brighton. From there, he will earn his GED. He hopes to gain acceptance to Operation Exit, a program developed to target people just like Mr. Constant, where he can work towards a career in the trade unions. In speaking with US Probation, referrals for Operation Exit's summer class of 2020 were due on May 1, 2020 but spots remain.

In light of the current unique situation facing our prisons, and supported by the 3553(a) factors, Mr. Constant asks the court to impose a sentence of time served, followed by 3 years of supervised release, and a recommendation to Probation to refer him to enter into Operation Exit.

Respectfully submitted,
JOQUENTZ CONSTANT
By his Attorney,

/s/ Cara McNamara
Cara McNamara
AK Bar. 0511088
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA   02210
Tel: 617-223-8061

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 20, 2020.

/s/ Cara McNamara
Cara McNamara